945 F.2d 536
 13 ITRD 1842, 60 USLW 2212, 1991
Copr.L.Dec. P 26,806,
20 U.S.P.Q.2d 1273
 The MISS AMERICA ORGANIZATION; Kenner Products, a division
of Tonka Corporation, Plaintiffs-Appellants,
v.
MATTEL, INC.; Nicholas F. Brady, Secretary of the U.S.
Treasury; Carol Hallett, Commissioner of U.S.
Customs; Anthony Liberta, New York
Regional Commissioner, U.S.
Customs, Defendants-Appellees.
 No. 1865, Docket 91-6111.
 United States Court of Appeals,
Second Circuit.
 Argued June 24, 1991.
Decided Sept. 25, 1991.
 
 Carol F. Simken, New York City (Weiss Dawid Fross Zelnick & Lehrman, P.C., of counsel), for plaintiff-appellant Miss America Organization.
 Sara L. Shudofsky, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty. for S.D.N.Y., Richard M. Schwartz, Asst. U.S. Atty., S.D.N.Y., of counsel), for defendant-appellee Nicholas F. Brady.
 Arthur J. Levine, Washington, D.C. (Laurence R. Hefter, Thomas W. Winland, Mark Traphagen, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., Thomas I. Sheridan, III, Richards & O'Neil, New York City, of counsel), for defendant-appellee Mattel, Inc.
 Donald E. DeKieffer, Washington, D.C. (J. Kevin Horgan, Pillsbury, Madison & Sutro, of counsel), filed a brief on behalf of The Intern. Anticounterfeiting Coalition, Inc. as amicus curiae.
 Before CARDAMONE, MINER and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The substantial legal issues presented by this appeal arise from a dispute over five 11 1/2 inch glamorous but--according to their maker--wholesome, high fashion dolls: "Blair," "Justine," "Tonya," "Devon," and "Raquel." The dolls, manufactured in China for plaintiffs, Kenner Products, a division of Tonka Corporation, and the Miss America Organization, a non-profit corporation that conducts the well-known beauty pageants, are the subject of this litigation because Mattel, Inc., the owner of the copyright on the ubiquitous "Barbie" doll, believes some of the five named dolls infringed its copyright. Not only important legal issues but also high economic stakes are packaged in these petite plastic figures. The "Barbie" doll is the best selling toy doll in the world--96 percent of three to eleven year old girls in the United States own at least one. In the past 30 years 600 million Barbie dolls have been sold--one is sold every two seconds--and, in 1990 alone 26 million of them were sold, earning gross revenues for Mattel of $740 million.
 
 
 2
 When Kenner began importing its "Miss America" line of dolls into the United States, Mattel asked U.S. Customs to detain them. Kenner and the Miss America Organization responded by suing Mattel and United States Customs in federal court. This appeal comes from the April 24, 1991 order of the United States District Court for the Southern District of New York, 760 F.Supp. 1107, (Sand, J.), denying plaintiffs' motion for a preliminary injunction that sought to order Mattel, Inc., Nicholas Brady, the Secretary of the United States Treasury, Carol Hallett, the Commissioner of United States Customs, and Anthony Liberta, the New York Regional Commissioner for United States Customs (defendants) to cease interfering with the importation and sale of their dolls in the U.S.--particularly from detaining shipments at the border--for Mattel to submit all its claims to the district court, and to withdraw requests for action before other judicial or administrative bodies. The district court held that the plaintiffs' failure to exhaust their administrative remedies in United States Customs, where proceedings in this matter are ongoing, precludes judicial intervention.
 
 
 3
 While this matter was sub judice the Intellectual Property Rights Branch of the United States Customs Service determined in an administrative decision dated August 6, 1991 that the overall appearances of three of the Kenner dolls' heads were "substantially similar" to the head of Superstar Barbie and, therefore, the dolls infringed Mattel's copyright. The plaintiffs have several avenues to obtain relief from the agency decision. Under the regulations, after Customs initiates its process for seizure and forfeiture the plaintiffs may petition for administrative relief and, if denied, for administrative reconsideration. See 19 U.S.C. §§ 1607, 1618; 19 C.F.R. §§ 133.51(a), 162.32(a), 171. Alternatively, if the plaintiffs timely appear and post bond, they may be entitled to judicial review of the Customs decision through a judicial forfeiture proceeding in the federal district court where the property was seized, in this case, the United States District Court for the Northern District of Ohio. See 19 U.S.C. § 1608; 19 C.F.R. § 162.47. In light of these developments, we asked the parties to respond to this administrative ruling. The parties responded and requested that this panel render a decision. We conclude that the case is not moot because the administrative proceedings remain ongoing, and therefore proceed to decide this appeal.
 
 BACKGROUND
 
 4
 The factual background of this case is not complicated. Together, Kenner and The Miss America Organization developed the Miss America line of fashion dolls, the profits from which were to go to Kenner and to fund Miss America pageant scholarships, the largest scholarship foundation in the world for young women. The venture began in May, 1990 when a designer at Kenner sketched four different drawings from which its sculptors created seven doll heads. Kenner selected three of them for the line of dolls. One of these heads was used for two dolls--"Devon" and "Tonya." Another head was used for "Blair," and the third was used for "Justine" and "Raquel." Kenner began manufacture of the dolls in China, and introduced them at a Toy Fair in New York in February, 1991. It has received over ten million dollars in customer orders and began placing the dolls in retail stores on February 21, 1991. Four television commercials were aired in April of 1991 and numerous other advertisements tied in with the Miss America Pageant were produced.
 
 
 5
 On March 11, prior to the airing of the commercials, Mattel contacted Customs and sought an exclusion order on the ground that two of the Miss America dolls--"Devon" and "Tonya"--were copies of the "Barbie" doll and therefore infringed on Mattel's copyright. Customs decided to detain further shipments of the dolls on "suspicion" of infringement; it reaffirmed its finding of suspicion on April 10.
 
 
 6
 On March 28, 1991 Kenner and the Miss America Organization sued Mattel in federal district court, seeking a judgment declaring that the dolls did not infringe Mattel's copyright, and a permanent injunction barring Mattel from further interference with their importation, distribution, or marketing. The complaint also asserted claims for misuse of copyright, unfair competition, and tortious interference with prospective economic advantage. Plaintiffs amended their complaint on April 12, 1991 to add United States Customs as a defendant and moved at the same time for the preliminary injunction, the denial of which is the subject of this appeal.
 
 
 7
 Mattel answered the Amended Complaint on May 1, 1991 and interposed counterclaims alleging that the importation of the "Devon" and "Tonya" dolls--as well as "Blair"--violated Mattel's copyright in the "Barbie" doll, and its rights under the Lanham Act and N.Y.Gen.Bus.Law § 368-d. In denying the plaintiffs' preliminary injunction motion on April 24, 1991 the district court stated it believed judicial intervention premature. It did not reach or decide whether a preliminary injunction should issue on the merits.
 
 
 8
 In a series of motions, plaintiffs sought various injunctions pending appeal of the district court's order, all of which were denied either by the district court or by this Court, though an expedited appeal was granted. In the meantime, Mattel had sought and received an exclusion order detaining the "Blair" doll as well as "Devon" and "Tonya" on suspicion of infringement. Customs has now detained a shipment of dolls pursuant to the original exclusion order. Because of the way in which they are packed and shipped--apparently the dolls are all together, not separately boxed by name--all five types of the "Miss America" dolls were held. Mattel has posted a bond in the amount of $505,450, equal to 300 percent of the value of the detained goods and duty, pursuant to Customs regulations.
 
 STATUTORY AND REGULATORY FRAMEWORK
 
 9
 To resolve this appeal, it is necessary to set forth the controlling statutory and regulatory framework. Section 603 of the Copyright Act of 1976 empowers the Secretary of the Treasury to make regulations to enforce the provisions of the law prohibiting importation of infringing goods. See 17 U.S.C. § 603(a) (1988). The regulations may require as a condition of exclusion that the person seeking exclusion obtain a court order, furnish proof in accordance with prescribed procedures that there is a valid copyright and the importation would infringe that copyright under 17 U.S.C. § 602 (1988) (importation of infringing copies), and/or post a surety bond for any injury that might result from an unjustified detention of the goods. 17 U.S.C. § 603(b) (1988).
 
 
 10
 The Treasury Department promulgated regulations setting forth the procedures to be followed by Customs in cases under § 602 where there is "suspicion" of the importation of infringing copies. 19 C.F.R. § 133.43 (1990). These procedures are distinct from those used in a clear case of piracy. See 19 C.F.R. § 133.42 (1990). The procedures applicable to "suspicion" cases provide that if a Customs district director
 
 
 11
 has any reason to believe that an imported article may be an infringing copy ... he shall withhold delivery, notify the importer of his action, and advise him that if the facts so warrant he may file a statement denying that the article is in fact an infringing copy and alleging that the detention of the article will result in a material depreciation of its value, or a loss or damage to him.
 
 
 12
 19 C.F.R. § 133.43(a) (1990).
 
 
 13
 The district director must further advise the importer that unless its denial is filed within 30 days of the detention of the goods, the goods will be subject to seizure and forfeiture. Id. If the importer does file a denial, the director must then notify and deliver a sample of the goods to the copyright holder, and give notice that the imported article will be released to the importer unless the holder files, also within 30 days, a written demand for the exclusion from entry of the detained article and a bond to cover any resulting damage to the importer if the Commissioner of Customs determines that the article is not infringing. 19 C.F.R. § 133.43(b) (1990).
 
 
 14
 If the copyright holder files a bond and a written demand for exclusion, the parties then have another 30 days to submit further evidence and legal briefs on the matter. The burden of proof is on the party claiming infringement. 19 C.F.R. § 133.43(c)(1) (1990). At the end of 30 days the entire file is forwarded to the Commissioner of Customs or his designee, who then determines whether the article is infringing. At any time prior to the submission of the file to the Commissioner, the copyright owner may withdraw his bond, but Customs must then release the detained goods. The regulations set no time limit for the Commissioner's decision. If the Commissioner determines the articles are not infringing, they are released to the importer and Customs transmits the copyright owner's bond to the importer. 19 C.F.R. § 133.44(b) (1990).
 
 
 15
 The copyright holder has an alternative route he may take. The owner may go into federal court to seek an order enjoining importation of the article, and then have Customs enforce that order. 19 C.F.R. § 133.43(d) (1990); 17 U.S.C. § 501 (1988). The alleged infringing importer has no comparable statutory right to seek judicial review. As a result of its duties under these regulations, Customs has developed expertise in determining whether articles are or may be infringing. It employs trained fraud teams at each port of entry who make hundreds of copyright determinations daily. Attorneys at Customs headquarters issue copyright advisory opinions five to ten times each day. The Customs service also hands down approximately 75 formal copyright infringement rulings each year.
 
 DISCUSSION
 
 16
 Whether the district court correctly held that judicial interference with Customs would be inappropriate in the case at hand, that is to say, exercised its discretion not to enjoin Customs either from detaining the dolls or from continuing to follow the administrative process provided for in the Regulations, subsumes a number of issues. We consider initially whether the exhaustion doctrine, which generally governs a request that a court grant a preliminary injunction to halt ongoing administrative proceedings, applies under the circumstances present in this case. Concluding that it does, we then take up whether, as plaintiffs contend, certain exceptions to that doctrine should come into play.
 
 I Exhaustion
 A. General Principles
 
 17
 The leading case involving the exhaustion of administrative remedies is McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). In McKart, the petitioner was indicted for willfully and knowingly failing to report for induction. When he registered for the Selective Service, McKart indicated that he was the sole surviving son of a family in which one or more sons or daughters were killed in action. He was later classified as exempt from service as a sole surviving son, but the local board reclassified him as available for military service after his mother died. When McKart refused to report for induction and was prosecuted, he asserted his status as a sole surviving son. The district court held he could not raise that defense because he had failed to exhaust the administrative remedies provided by the Selective Service System. Id. at 187, 89 S.Ct. at 1659.
 
 
 18
 In the course of reversing the conviction, the Supreme Court engaged in an extensive review of the policies underlying the exhaustion doctrine. It stated that the exhaustion "doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.' " McKart, 395 U.S. at 193, 89 S.Ct. at 1662 (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938)). The Court noted that the reasons underlying the application of the doctrine include "the avoidance of premature interruption of the administrative process[,] ... let[ting] the agency develop the necessary factual background upon which decisions should be based," and giving the agency the first chance to exercise its discretion or apply its expertise. Id. at 193-94, 89 S.Ct. at 1662; see also Schlesinger v. Councilman, 420 U.S. 738, 756, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975) (exhaustion "is based on the need to allow agencies to develop the facts, to apply the law in which they are peculiarly expert, and to correct their own errors"); Diapulse Corp. of Am. v. F.D.A. of the Dep't of Health, Educ. & Welfare, 500 F.2d 75, 77-78 (2d Cir.1974) (same as McKart ); cf. Dor v. District Director, INS, 891 F.2d 997, 1001 (2d Cir.1989) (applying McKart principles).
 
 
 19
 McKart also held that the general policy of avoiding judicial interference with a separate entity invested with its own powers and duties until the agency "has completed its action, or else has clearly exceeded its jurisdiction" is particularly appropriate "where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise." 395 U.S. at 194, 89 S.Ct. at 1663; see T.I.M.E.-DC, Inc. v. Management-Labor Welfare & Pension Funds of Local 1730 Int'l Longshoremen's Ass'n, 756 F.2d 939, 945 (2d Cir.1985). Further, as a practical matter of judicial efficiency, vindication of rights in the administrative process may eliminate any need for judicial action. 395 U.S. at 195, 89 S.Ct. at 1663; Schlesinger, 420 U.S. at 756-57, 95 S.Ct. at 1312. Moreover, deliberate by-passing of administrative processes over time would make the administrative agency ineffectual. See 395 U.S. at 195, 89 S.Ct. at 1663.
 
 
 20
 Plaintiffs argue that McKart and the case upon which it relied in discussing the exhaustion doctrine, Myers, 303 U.S. 41, 58 S.Ct. at 459, are not on point. They reason that, unlike the Selective Service System which provided for no judicial review, but exclusively for an administrative remedy, and unlike the National Labor Relations Act involved in Myers, which provided for an exclusive administrative remedy to be followed by judicial review, the Copyright Act contains no mandate that the issue of infringement first be tested in an administrative procedure within Customs. We are not persuaded by this argument.
 
 
 21
 The Supreme Court did not limit the general principles it enunciated in McKart to cases of explicit exclusive jurisdiction. 395 U.S. at 193, 89 S.Ct. at 1662 (doctrine applies both to cases in which the relevant administrative procedure has explicitly been made exclusive and to cases in which exclusivity is not explicit). Nor do the policies underlying the general idea of the exhaustion of remedies change simply because the relevant administrative scheme stands in a different relation to judicial review--that changes only the force with which the policies point to a need for exhaustion of remedies. For this reason, the doctrine of exhaustion "is applied in a number of different situations" and its application to specific cases "requires an understanding of its purposes and of the particular administrative scheme involved." Id. at 193, 89 S.Ct. at 1662.
 
 
 22
 Additionally, the exhaustion doctrine has been applied in a case where the Supreme Court recognized that the federal courts had concurrent jurisdiction over the issue under collateral attack with an executive agency, in that case the military. Schlesinger, 420 U.S. at 744-53, 95 S.Ct. at 1306-10. That case is jurisdictionally, if not factually, similar to the instant one in that both an executive branch agency (Customs) and the courts had parallel jurisdiction, and the claimant wished the courts to enjoin the agency from further action. Thus, as in the instant case, the question before the Supreme Court was not one of jurisdiction, but instead whether "consistently with the principles governing equitable relief the court may exercise its remedial powers." Id. at 754, 95 S.Ct. at 1311.
 
 B. Other Jurisdictional Arguments
 
 23
 Plaintiffs make three other arguments against application of the exhaustion doctrine; the first two are based on statutes while the third relies on case law. First, they argue that they are not required to proceed through the process set forth in the Customs regulations because federal courts have exclusive jurisdiction over copyright actions. It is true that the district courts have original and exclusive jurisdiction over such actions under 28 U.S.C. § 1338(a) (1988), but that jurisdiction is "exclusive of the courts of the states." Id. Simple logic dictates that because federal courts have jurisdiction exclusive of the states provides no help in deciding whether their jurisdiction is also exclusive of an administrative proceeding within the executive branch.
 
 
 24
 Nor does it make sense that Congress would vest exclusive jurisdiction in the courts at the same time it directs the Secretary of the Treasury to enact regulations to aid in the prevention of copyright infringement, implicitly contemplating some determination by that agency as to whether an item might be infringing. In addition, though plaintiffs claim that the legislative histories of 17 U.S.C. §§ 602 and 603 indicate Congress gave Customs authority over importation of infringing copies only because foreign importers outside the jurisdiction were not amenable to being sued in the United States, whereas plaintiffs are amenable to suit, the statute itself contains no such limitation of Customs' authority.
 
 
 25
 Plaintiffs urge further that because Mattel had a choice of remedies under the Copyright Act and the Regulations, see 17 U.S.C. § 501(b) (1988) (right to bring action for infringement) and 19 C.F.R. § 133.43 (1990) (right to pursue exclusion order), it follows that Congress did not choose administrative procedures over court action and that plaintiffs should also be entitled to a similar choice. This proposition is a non-sequitur. By enacting the copyright laws Congress favored creators of original works over those who might copy them. This policy is furthered by granting copyright holders a broader range of legal options to protect themselves from infringement than those given alleged infringers to press their claims of innocence. It is not our place to interfere with this unsurprising scheme. Congress has already balanced the interests of the importer and the copyright owner. Cf. Schlesinger, 420 U.S. at 757-58, 95 S.Ct. at 1312-13 (by enacting the Code, Congress formulated a device to adjust competing interests; implicit in it is the view that the system of military courts is adequate to its assigned task).
 
 
 26
 Plaintiffs also cite two cases, Croton Watch Co. v. Laughlin, 208 F.2d 93 (2d Cir.1953), and L. Batlin & Son, Inc. v. Snyder, 394 F.Supp. 1389 (S.D.N.Y.1975), aff'd en banc, 536 F.2d 486 (2d Cir.), cert. denied, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976), to support their view that the district court has authority to decide issues of copyright in cases involving Customs detention. Neither is helpful. In Croton, the question of exhaustion of remedies and the impact on the court's jurisdiction arising from the presence of administrative remedies was not in issue. Id. at 96. In Snyder, the jurisdictional question was not discussed, rather the court merely held that there was little likelihood that the defendant would be successful on the merits because the copyright at issue was found to be a work in the public domain without originality. Id. at 1390. That case too does not implicate the doctrine of the exhaustion of administrative remedies, the first panel opinion reversing the district court noted it did not appear that exhaustion had even been raised. See L. Batlin & Son, Inc. v. Snyder, 187 U.S.P.Q. 721, 724 n. 4 (2d Cir.1975). Thus, neither case provides persuasive, much less binding, authority that the district court should exercise its discretion to provide equitable relief in a case involving Customs' detention of imported goods.
 
 
 27
 C. Application of Exhaustion Principles in This Case
 
 
 28
 We now turn to the question of whether--considering the policies enunciated in McKart, Myers, and Schlesinger--the present circumstances mandate the invocation of the exhaustion doctrine to bar judicial interference in the administrative process. Federal courts have jurisdiction exclusive of any state court over copyright cases, 28 U.S.C. § 1338(a), reflecting the federal nature of copyright law, which itself derives from the Copyright Clause of the United States Constitution. U.S. Const. art. 1, § 8, cl. 8; 1 Nimmer, Copyright, § 1.01[A] at 1-3 (1989). The district court plainly has jurisdiction over plaintiffs' demand for a declaratory judgment that the dolls are not infringing, as well as over the infringement claim brought by Mattel in its counterclaim.
 
 
 29
 The Treasury Department also has been assigned the duty of enforcing the copyright laws in cases in which there is reason to believe an imported item may be an infringing copy. Any action taken in fulfillment of that duty therefore lies, as it were, within the jurisdiction of Customs. We therefore must ask whether, given such concurrent jurisdiction, the district court in this case should exercise its jurisdiction to interfere with administrative proceedings that are properly brought and now ongoing.
 
 
 30
 A strong argument may be made that the exhaustion doctrine bars such interference. To allow plaintiffs to avoid the procedure Congress mandated in § 603 would set a precedent without perceivable limit that could be invoked by other importers whose goods have been detained. Plaintiffs say their case is unusual--and would not set such a precedent--because they are suffering irreparable harm due to time constraints in filling contract orders in marketing their product, and damage to their reputation as reliable suppliers. Theirs is an unusual case, they also assert, because the Miss America line is a major new product introduction important to the financial health of the company, they have a unique opportunity to enter a large, long-term market, and most other importers do not rely on a single item as heavily as they are and are not "involved with seasonal marketing concerns."
 
 
 31
 All of these arguments are, of course, routinely available to any importer that has invested a great deal of money in goods that have been detained. Most importers would secure customer orders before importing goods, and would be able to argue that they are losing a large investment, and a unique opportunity to enter a market, if they must submit to the Customs' procedures. All merchants are naturally concerned with their reputations. As to seasonal sensitivity and reliance on a single product, Kenner has presented no proof that its financial viability as a company hinges on the success of this one line of dolls. In fact, in its Amended Complaint it stated that it is "one of the leading and best known American toy companies, [and] sells a diverse line of toys throughout the world." In addition, a number of Miss America dolls already have entered the country, have been introduced at the Toy Fair, and are now gracing retail shelves.
 
 
 32
 Further, there are other importers whose products are sensitive to seasonal marketing, as well as a large number who have only one product line. In short, we have no doubt that were we to rule in Kenner's favor, the Customs exclusion order process would be eviscerated because there is nothing unique about Kenner's circumstances that would justify judicial crafting of a different rule in its favor. At the very least we would encourage increased litigation in federal court by opening the door for parties to argue they fit whatever exception to the exhaustion rule this case would carve out.
 
 
 33
 Plaintiffs also contend that only six cases in the last 40 years have been reported in which a party has sought relief from Customs detention in a trademark or copyright context. This proves only that plaintiffs have chosen to tread a path not often taken and not, as they would have us believe, that only in rare cases will an importer follow their lead. With respect to the contention that few will wish to attempt to meet the heavy legal burden faced by a party seeking an injunction, it seems more likely that once the legal gates have been lowered, many will hurdle the costs of filing and attorneys' fees to move for an injunction on the off-chance they can meet the legal test for obtaining that relief. Again, were we to determine that plaintiffs in this case had satisfied the preliminary injunction standard, then this case would not be the exception, but the rule, for every importer would be able to allege the type of injury plaintiffs allege. Such a result would effectively turn the Congressional scheme set forth in 17 U.S.C. §§ 501 and 603--granting the copyright holder its choice of forum and expressing a policy of giving the holder an advantage over the alleged infringer--upside down.
 
 
 34
 The other policies mentioned in McKart also support the conclusion we reach. Allowing the plaintiffs to invoke judicial review would prematurely interrupt the administrative process, for at this point, though Customs has determined that the Kenner dolls infringe on Mattel's copyright, the agency's seizure and forfeiture process has yet to be completed. A Customs determination regarding infringement also may eliminate any need for judicial action, if only because the losing party may decide judicial review on the infringement issue is not worth the cost. Plaintiffs argue that in this case, no judicial efficiency will be served because they have sued on claims outside Customs' jurisdiction that will remain in court, and because they fully intend to pursue any infringement determination. These arguments are unavailing. First, the losing party will not always seek to obtain judicial review of an adverse administrative decision. That the plaintiffs intend to pursue the infringement determination in this instance does not warrant precedential intrusion on the part of the judiciary. Second, if an administrative process could be so easily by-passed by adding a few more causes of action onto a request for preliminary relief, then every importer would take this tack and the courts would become the primary adjudicators not only of every dispute involving detained imported goods, but of numerous side claims as well.
 
 
 35
 Appellants' contention that the legislative history of the 1976 Copyright Act indicates that Customs has no expertise in making determinations of infringement is also unpersuasive. They cite a House Report for the proposition that, under the previous act, Customs was "often in no position to make determinations as to whether particular articles [we]re 'piratical.' " H.R.Rep. No. 94-1476, 94 Cong., 2d Sess. 171 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5787. But the last part of the sentence, which was not quoted, clearly indicates the difficulty only existed under the earlier act because the copyright holder did not need to submit proof of infringement. Now that the statutes and regulations require such proof, Customs is in a position to make that determination.
 
 
 36
 Further, plaintiffs' reliance on Goya Foods, Inc. v. Tropicana Prods., Inc., 846 F.2d 848 (2d Cir.1988), as authority for the proposition that Customs does not have expertise in infringement determinations does not help them. In Goya, the question presented was whether a district court could stay trademark infringement litigation pending the outcome of registration proceedings before the United States Patent and Trademark Office. Id. at 851. While it is true that in the course of distinguishing the case before it from cases in which the application of the "primary jurisdiction" doctrine was appropriate, the court found that "[l]ikelihood of consumer confusion ... is a legal standard with which courts have long-standing familiarity in resolving suits" and thus was within the traditional competency of the court, id. at 853, this language was meant to distinguish cases implicating the notion that primary jurisdiction applied. Primary jurisdiction is related to the exhaustion doctrine. It has effect when Congress has delegated initial or exclusive responsibilities to an administrative agency to resolve certain issues in complex matters in which the agency has special competence. See Aircraft & Diesel Equip. Corp. v. Hirsch, 331 U.S. 752, 767-68, 67 S.Ct. 1493, 1500-01, 91 L.Ed. 1796 (1947); Goya Foods, Inc., 846 F.2d at 851. We do not believe that doctrine comes into play in copyright jurisprudence.
 
 
 37
 Congress has granted Customs some independence and autonomy in making determinations of infringement regarding items imported into the United States, and as a separate executive agency with its own powers and duties, it is entitled to our forbearance as it carries out its duties. That federal courts are competent to make infringement determinations does not lead to the conclusion that Customs is not. Because federal courts may have a greater knowledge of and ability to apply the copyright statute, due to their broad experience in applying that statute, should not be a reason--so long as Customs proceeds in conformity with the statutory scheme--to enjoin the Service from performing its statutory duties. See McKart, 395 U.S. at 194, 89 S.Ct. at 1662; Dor, 891 F.2d at 1001.
 
 II Exceptions
 A. Statutory Exception
 
 38
 Whether the district court correctly found the case does not fall within two of the exceptions to the exhaustion doctrine is next discussed. The first of the exceptions invoked by appellants occurs when the issue presented to the court is "one of purely statutory interpretation." Touche Ross & Co. v. S.E.C., 609 F.2d 570, 577 (2d Cir.1979); see T.I.M.E.-DC, 756 F.2d at 945. This exception exists primarily because there is no need for the exercise of any agency expertise or discretion where there is a question of statutory interpretation. See Touche Ross & Co., 609 F.2d at 577. Plaintiffs declare this case falls within this exception because the question of infringement is a "legal question relating to the scope of copyright protection." They insist the courts, not Customs, are experts on questions regarding what is copyrightable and whether there is substantial similarity.
 
 
 39
 Whether one particular item infringes on another particular item is not the sort of general legal principle calling for the kind of statutory interpretation to which the exception applies, but is instead one calling for a decision based on a factual record. See Financial Info., Inc. v. Moody's Investors Serv., Inc., 808 F.2d 204, 207-08 (2d Cir.1986) (finding of originality of allegedly infringing article is a finding of fact), cert. denied, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). If this kind of simple application of law to fact were the kind of "statutory interpretation" that eliminated the need to comply with the administrative remedies, the exception would swallow the rule, for every case involves this kind of statutory "interpretation."
 
 
 40
 In contrast to those cases in which the exception has been applied, here there is no question regarding the scope or interpretation of the Copyright Act in any way that would set a broad legal rule applicable to other cases. See, e.g., T.I.M.E.-DC, 756 F.2d at 945 (question presented was whether provisions operated as condition precedent to assessment of liability, which was question of statutory interpretation not connected to any resolution of questions of fact); Diapulse Corp., 500 F.2d at 77-78 (dispute over whether Freedom of Information Act authorized the FDA to charge high fees for release of information was a question that could be resolved without development of factual record or exercise of discretion); Beard v. Gen. Serv. Admin., 801 F.2d 1318, 1321 (Fed.Cir.1986) (whether Civil Service Reform Act of 1978 required Merit Systems Protection Board to determine independently the proper penalty for violations of agency rules was a question of law that did not require development of a factual record). Thus, the statutory exception does not apply in the case at hand.
 
 B. Inadequate Protection
 
 41
 The second exception to the exhaustion doctrine may be termed the "inadequate protection" exception. If " 'an immediate appeal is necessary to give realistic protection to the claimed right' ... a court may properly carve an exception to the [exhaustion] doctrine." Bristol-Myers Co. v. F.T.C., 469 F.2d 1116, 1118 (2d Cir.1972) (quoting L. Jaffe, Judicial Control of Administrative Action 429 (1965)); T.I.M.E.-DC v. N.Y. State Teamsters Conference Pension & Retirement Fund, 580 F.Supp. 621, 633 (N.D.N.Y.1984) ("exhaustion is not required 'when the nonjudicial remedy is clearly shown to be inadequate to prevent irreparable injury' ") (quoting Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund, 693 F.2d 290, 293 (3d Cir.1982)). It is only in a rare circumstance that the preliminary or procedural agency action will "threaten so irreparable an injury as to justify interlocutory resort to corrective judicial process." Bristol-Myers, 469 F.2d at 1118. Having to litigate an issue is not the sort of injury adequate to justify the application of this exception. Id.
 
 
 42
 The parties disagree as to what kind of harm plaintiffs are facing and whether it is irreparable. It is plaintiffs' belief that the entire success of the line of dolls depends on the success of its launch, and that if they are not in a position to deliver the dolls soon, their orders will drop off and they will be locked out of the trade. They argue that the administrative procedure is inadequate to protect them from this harm because the procedure itself is time consuming and because there was no time limit within which Customs was required to issue a decision. Even were it to succeed in its infringement dispute after judicial review of the Customs order finding a copyright infringement, Kenner argues, it would then be too late to rectify the harm befalling it. Appellants insist additionally that the reputations of Miss America title holders will be damaged because of their association with a commercial failure, and that the Miss America organization would suffer a loss of reputation and reduced scholarship funds.
 
 
 43
 Defendants respond that, at bottom, this claim is that delay will cost appellants grievous economic loss, and that this type of loss is not irreparable damage. See Johnpoll v. Thornburgh, 898 F.2d 849, 851 (2d Cir.) (per curiam) ("economic loss does not in and of itself generally constitute 'irreparable injury' which might excuse requiring a plaintiff to exhaust administrative remedies and justify preliminary injunctive relief"), cert. denied, --- U.S. ----, 111 S.Ct. 63, 112 L.Ed.2d 38 (1990). The cases upon which defendants rely in support of this argument--Petroleum Exploration, Inc. v. Public Serv. Comm'n, 304 U.S. 209, 220-22, 58 S.Ct. 834, 840-41, 82 L.Ed. 1294 (1938), and Myers, 303 U.S. at 47-48, 53, 58 S.Ct. at 461-62, 464--involved preliminary agency action. The injuries alleged in all of these cases were either simple delay, the cost of litigation, loss of reputation or, in Myers, an increased potential for labor disturbances. While these cases demonstrate that delay, loss of business reputation, and the cost of litigation alone are insufficient to establish irreparable harm, they leave open the question of what degree of harm will be sufficient to trigger the exception when the agency has taken or is about to take some substantive action such as seizing the plaintiff's goods--that is, some agency action that goes beyond the investigatory stage.
 
 
 44
 Plaintiffs point to two cases in which a court has found irreparable harm allowing a party to bypass an administrative remedy. First, in B. Wilmsen, Inc. v. Consolidated Novelty Co., 251 F.Supp. 874, 875-77 (S.D.N.Y.1965), irreparable injury was found in the loss of customer orders and lay-off of employees. To the extent that this case suggests that such calculable damages may form the basis for a finding of irreparable injury, we think it was wrongly decided in light of the Supreme Court precedents discussed earlier.
 
 
 45
 The second case upon which plaintiffs rely is better authority. In T.I.M.E.-DC, it was found that, because of a strike, the company had lost ten million dollars in shareholder equity, all of its general commodities customers, and most of its terminal employees. 580 F.Supp. at 631-32. The uncontradicted testimony of a top company official was that if plaintiffs were allowed to pursue their claims against the company, it would not survive because it would create the perception that the company would be closed and because competitors would "trumpet" its difficulties to take away customers. Id. at 631.
 
 
 46
 Having outlined these circumstances, the court held that "threats of diminished consumer confidence and elimination of business opportunities are clearly consequences constituting irreparable harm." Id., citing Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975) (uncontradicted allegation that bankruptcy would result meets standards for granting interim relief) and Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 444-45 (2d Cir.1977) (party's "ample evidence" of threatened loss of goodwill and customers supported finding of irreparable harm that could not be rectified by money damages); see B. & R. Choiniere Ltee. v. Art's-Way Mfg. Co., Inc., 207 U.S.P.Q. 969, 972 (N.D.N.Y.1979) (court that had extensive knowledge of the case credited testimony that detention of goods would threaten to put company out of business and testimony that detention would imperil profitable operation of the company); see also Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907-08 (2d Cir.1990) (loss of customers and goodwill can constitute irreparable harm). The parties in T.I.M.E.-DC went into extensive detail in arguing the financial prospects of the company, 580 F.Supp. at 631-32, and the court held that the threat was one presently existing, rather than "a possibility of a remote future injury," because "the evidence has established beyond any doubt that TIME-DC would suffer a devastating blow were the Fund permitted to assert withdrawal liability." Id. at 632 (citation omitted).
 
 
 47
 In the instant case, plaintiffs' dolls were not, and would not have been, held indefinitely. Because the dolls were found to infringe upon Mattel's copyright, the plaintiffs suffered no legally cognizable harm from the detention of the dolls. If, upon administrative reconsideration or judicial review, the Customs' decision is overturned, then any loss due to orders cancelled within the period of time within which the dolls were detained may, like any lost scholarship funds, be calculated in money damages.
 
 
 48
 As to the claims of loss of business opportunities and market, plaintiffs are required to make a "clear showing" of harm by virtue of the delay, M.G. Davis & Co. v. Cohen, 369 F.2d 360, 363 (2d Cir.1966), and the proof offered in this case does not match the proof of harm shown in T.I.M.E.-DC, Doran, and Jacobson. In those cases there was more than ample proof credited by the court of the broad effect of the action at issue, while here Kenner and the Miss America Organization have submitted only a single affidavit, from Kenner's Vice President for Marketing, that repeats the allegations of harm but furnishes no actual proof that the delay involved in waiting for the Customs infringement decision will have caused such great loss of goodwill or market that the total harm would not be compensable through monetary damages, much less any proof that Kenner will go bankrupt. See Wales Indus. Inc. v. Hasbro Bradley, Inc., 612 F.Supp. 507, 508-09 (S.D.N.Y.1985) (plaintiff claimed that unless a court made an early determination of the validity of defendant's copyrights its shipments might be delayed or detained by Customs, it might lose prospective sales and, as a new company, would be severely damaged in its business and reputation if it were forced to cancel pending purchase orders; court held that greatest risk of loss--inability to fill orders--could be calculated in money damages, and loss of future business opportunities claims unsupported, so no irreparable harm shown). Mattel has submitted a similar affidavit that counters at least some of plaintiffs' unsupported assertions regarding the effect of the timing of a product introduction in the toy industry. Moreover, any connection between commercial harm to the sale of a line of dolls called "Miss America" dolls and harm to the reputations of Miss America contest winners is at best tenuous.
 
 
 49
 Because we hold that plaintiffs have failed to demonstrate that they will suffer any irreparable harm, we need not address whether the Customs process would provide inadequate protection were plaintiffs to submit sufficient proof of irreparable harm. Under the existing circumstances we are satisfied that the district court properly exercised its discretion when it declined to interfere with what continues to be an ongoing administrative proceeding.
 
 CONCLUSION
 
 50
 The judgment of the district court denying the preliminary injunction is affirmed.