**Joanne SELMON and Renee Strong, individually and doing business as Engrav-It, Plaintiffs,**

v.

**HASBRO BRADLEY, INC., Hasbro Industries, Inc. and Walt Disney Productions, Defendants.**

**No. 86 Civ. 8260 (GLG).**

United States District Court, S.D. New York.

Sept. 16, 1987.

Felfe & Lynch, New York City (Thomas A. Beck, of counsel), for plaintiffs.

Parker Auspitz Neesemann & Delehanty, P.C., New York City (Kim J. Landsman and Robin C. Gelburd, of counsel), for defendant Hasbro, Inc.

Edward J. Nowak, New York City, for defendant Walt Disney Co.

## OPINION

GOETTEL, District Judge:

Once upon a time, in lands far, far away, lived strange but cuddly creatures that became involved in a struggle for identity. In "Whatland," which is just a few miles north of Fairyland, lived the "Whats." In the "Land of Wuz" lived the "Wuzzles." We don't know where "Wuz" was, but we are told we could get there if we "snuzzle a Wuzzle." It appears that for a time, never the two did meet. But one day the creators of the "Whats" discovered the "Wuzzles" and were astonished to learn that "Whats" and "Wuzzles" had certain similarities. Most specifically, it seems each "What" and "Wuzzle" had the names and characteristics of two different animals combined into one. In "Whatland," there was "Me-ouse" (a mouse and cat combined), "Wissh" (a walrus and seal), "Chuck" (a chicken and duck), "Skeet" (a skunk and parakeet), "Pea-tur" (a peacock and turkey), "Gir-itch" (a giraffe and ostrich), "Leo-Lamo" (a lion and lamb), and "Beav-aire" (a beaver and bear). The "Wuzzles" included "Moosel" (a moose and seal), "Butterbear" (a butterfly and bear), "Hoppopotamus" (a rabbit and hippopotamus), "Eleroo" (an elephant and Kangaroo), "Rhinokey" (a rhinoceros and monkey), and "Bumblelion" (a bumblebee and lion).

Our story now moves to its sad conclusion. The creators of the "Whats," who were protected by copyright, were out-

raged and thought that the creators of the "Wuzzles" had stolen their idea. A lawsuit broke out, with the plaintiffs, creators of the "Whats," alleging violation of the federal copyright laws and unjust enrichment. The defendants, creators of the "Wuzzles," have moved for summary judgment, as well as attorney's fees and sanctions under 17 U.S.C. § 505 of the Copyright Act, 28 U.S.C. § 1927, and Rule 11 of the Federal Rules of Civil Procedure for plaintiffs' pursuit of allegedly frivolous and vexatious litigation.

This battle on high between creators has filtered down to us in this "What"-less and "Wuzzle"-less Land of White Plains. The questions before us are really quite simple: "Just what's a "What," what's the similarity between a "What" and a "Wuzzle," and "Wuzzle" we do about it?"

### I. Facts

Plaintiffs, doing business as Engrav-it, created eight fanciful characters they called "Whats" (described above) from "Whatland." The characters were created by combining characteristics and names from two different animals into one. On September 24, 1984, plaintiffs registered the "Whats" characters, short storylines in poetic form about the characters, and a brief overview entitled "What's What in Whatland" with the federal copyright office.

On September 21, 1984, plaintiffs sent copies of this material with a cover letter to defendant Hasbro Bradley, Inc. (Hasbro) and Walt Disney World of Florida. A similar package was sent later to defendant Walt Disney Productions of California (Disney). Each ultimately wrote back to plaintiffs and returned the submission.

The facts further reveal that as early as 1982, Disney was working on a project called "Jumble Isle," which involved characters similar in concept to plaintiffs' "Whats." "Jumble Isle" was registered for copyright protection on April 18, 1984, well before plaintiffs' submission. In May of 1984, Disney broached with Hasbro the idea of marketing a line of "Jumble Isle" toys. It was discovered that Hasbro already was working on its own, very similar project. The defendants agreed to join forces and collaborate on what became the "Wuzzles" project.

Six "Wuzzles" (described above), complete with storylines, were registered for copyright protection in January of 1985 and were introduced officially to the public at the February 1985 Annual Toy Fair in New York City. Although defendants' creative work on this initial introduction was substantially complete by September 21, 1984, which both parties agree is the earliest possible date that defendants could have become aware of plaintiffs' works, it appears that not all details had been finalized. The best that can be said as to this point is that the facts are unclear. Whatever, it is clear that six additional "Wuzzles" were introduced in 1986, well after the time defendants had received plaintiffs' unsolicited submissions. The additional "Wuzzles" included: "Tycoon" (a tiger and racoon combined), "Pandeaver" (a panda and beaver), "Skowl" (a skunk and owl), "Piggypine" (a pig and porcupine), "Woolrus" (a walrus and lamb), and "Koalakeet" (a koala and parakeet). The line was discontinued in 1987.

When plaintiffs became aware that Disney/Hasbro was marketing the "Wuzzles" line, they commenced this action.

### II. The Motions for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the moving party to demonstrate the absence of a material, factual dispute. Fed.R. Civ.P. 56(e); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If that burden is met, "the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, the court must resolve all ambiguities and draw all

reasonable inferences in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Although summary judgment cannot be viewed as a substitute for trial, *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.1987), it is a valuable tool, properly used, for weeding out frivolous and unsubstantiated claims, and, contrary to prior opinions, we are told it is alive and well in this Circuit. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). We turn now to the specific claims in the case at bar.

a. The Copyright Claim

■ As this Court recently stated, the central thrust of the Copyright Act is protecting tangible expressions of ideas. *Silverman v. CBS Inc.*, 632 F.Supp. 1344, 1349 (S.D.N.Y.1986) (relying on *Mazer v. Stein*, 347 U.S. 201, 214, 74 S.Ct. 460, 468, 98 L.Ed. 630 (1954)). To sustain an action for copyright infringement, a plaintiff must prove (1) a valid copyright and (2) the unauthorized copying of the copyrighted work. *Warner Bros., Inc. v. American Broadcasting Co.*, 654 F.2d 204, 207 (2d Cir.1981). Defendants here do not dispute that plaintiffs have a valid copyright, although plaintiffs themselves seem somewhat unsure as to just what is protected by that copyright.

Direct evidence of copying is rarely available, and none has been presented here. Copying, however, may be inferred (and at this stage, we must draw any reasonable inferences in the plaintiffs' favor) by showing (1) that defendants had "access" to the copyrighted material, and (2) that defendants' work bears a "substantial similarity" to that material. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.1986); *Warner Bros.*, 654 F.2d at 207. It is important to underscore that there must be at least an arguable showing as to both prongs of this test if plaintiffs are to survive this motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)

(holding summary judgment proper when party fails to show sufficiently "existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

With respect to access, both defendants offered affidavits asserting that none of their creative people see unsolicited submissions. Hasbro produced evidence that, as a matter of course, when unsolicited submissions are received in the mailroom they are forwarded immediately to the legal department for return to the sender(s). It claims that at no time do its creative people "peek" at or become aware of unsolicited submissions. In his September 29 letter returning plaintiffs' submission, Hasbro's Corporate Secretary advised that "present policy does not permit us to accept outside submissions ... due to the heavy volume of material sent and the possibility of conflict with our own research program." It is clear that Hasbro has taken steps to try to insulate itself from suits such as it is now forced to defend. Further, despite the fact that it was Hasbro's Corporate Secretary and not its legal department that answered plaintiffs' inquiry, it appears that Hasbro generally complied with its own policy, especially given the short turnaround time between submission and return.

Disney, however, was less careful. Plaintiffs maintain that on or about October 3, Al Stratton, Merchandise Buyer for Disney World in Florida, telephoned plaintiffs, acknowledged receipt, and asked if the "Whats" were trademarked. Although plaintiffs' submission was returned via Stratton letter dated October 10, the letter advises that Stratton would keep a copy of the submission on file "in the event it could be used in the future," and further states that the plaintiffs' submission "has been discussed and reviewed by the appropriate Buyers and Managers in our Merchandising Division."[1] Plaintiffs later forwarded a similar package to defendant Disney Productions of California, but it was returned immediately.

---

1. Disney World does not manufacture toys, but it does sell them (apparently in large quantities)   in its amusement park.

Disney World is a wholly-owned subsidiary of Disney Productions. The question turns on the possibility that plaintiffs' submission to Disney World, which apparently had been "discussed and reviewed," could have found its way "upstream" to Disney Productions, which was then collaborating with Hasbro on the "Wuzzles" project.

Alternatively, defendants argue that only access gained "prior to the creation of defendant's work" can support an inference of copying. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.1987). We are referred to no Second Circuit cases on point,[2] but it would seem to follow, ipso facto, that if access is gained following a project's completion, access becomes irrelevant. The undisputed facts clearly reveal that, by September 21, the defendants virtually had completed all creative work on the "Wuzzles" project. Hasbro began working on the project in the fall of 1983. In March of 1984, with the concept considerably refined, an outside marketing firm was retained to conduct a market survey. Also in March, Hasbro's research and design department presented the engineering department with a preliminary package, including final drawings and sewing patterns for the toys. Six of the characters then presented (three with slight modification later on) were to become the six toys actually introduced in 1985. On May 11, 1984, the engineering department issued a "final takeover package" (FTP) for the project that included specifications in minute detail for each of the characters. In June of 1984, Hasbro executives flew to the Far East to select fabrics and meet with vendors who would produce the toys. In July, Carnival Enterprises was retained to develop a storyline for the "Wuzzles" from the "Land of Wuz," and preliminary storylines were submitted on July 12. All of this preparatory work had been completed before the plaintiffs mailed their package on September 21, 1984.

Plaintiffs argue that defendants' work, although substantially complete, was not finalized until after plaintiffs' submission. As evidence of this contention, they argue that three of the characters originally contained in the May 1984 FTP were modified before market introduction in 1985, and that those changes were made after September 21. It is clear that "Spotopotamus," "Seal-A-Saurus," and "Ring-A-Rang-A-Tang," all characters in the May FTP, were changed at some time to become "Hoppopotamus," "Moosel," and "Rhinokey," respectively. Exactly when those changes occurred is unclear.

However, whether the Stratton telephone call and letter are sufficient to create a reasonable inference of access, or whether defendants' considerable evidence of independent creation is sufficient as a matter of law to negate a finding of access, are matters we need not reach. Plaintiffs' inability to clear the "substantial similarity" hurdle renders these issues moot.

As noted above, material facts as to both prongs of the copying test (access and substantial similarity) must be in issue if plaintiffs are to survive a summary judgment motion. The rationale for this requirement seems clear—even if defendants had access to copyrighted material, if substantial similarity between defendants ultimate product and the copyrighted material cannot be shown, no inference of copyright infringement can be justified and access is rendered irrelevant. The record on this issue leaves no room for doubt.

The copyright laws protect "only the work's particular expression of an idea, not the idea itself." *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir.1982). In determining whether

---

**2.** This Circuit has held that "[e]vidence of independent creation may be introduced by a defendant to rebut a plaintiff's prima facie case of infringement." *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 501 (2d Cir.1982). However, evidence of independent creation is being offered here to negate an essential element (access) of plaintiffs' prima facie case. Defendants, relying on *Eden Toys*, also seek to introduce evidence of independent creation as a "complete defense" to a claim of infringement. Holding as we do that plaintiffs have not met their prima facie burden, we need not determine whether defendants properly rely on *Eden Toys* for the proposition cited or whether they have presented sufficient evidence of independent creation to entitle them, as a matter of law, to summary judgment.

copying of a particular, copyrighted expression may be inferred, the general test for substantial similarity is "whether the average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Warner Bros.*, 654 F.2d at 208 (quoting *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966)). When the infringement involves cartoon-like characters, as here, courts have considered "not only the visual resemblance but also the totality of the characters' attributes and traits [in determining] the extent to which the allegedly infringing character captures the 'total concept and feel' of the copyrighted character." *Warner Bros., Inc. v. American Broadcasting Co.*, 720 F.2d 231, 241 (2d Cir.1983) (citations omitted). Although we find some conceptual similarity between plaintiffs' and defendants' creations,[3] we do not find substantial similarity in the particular expressions of those ideas, nor do we find that defendants' "Wuzzles" capture the "total concept and feel" of plaintiffs' works.

First and foremost, no "Wuzzle" is comprised of the same two animals comprising any particular "What." In our view, the most similar combinations are the "Beavaire," a "What" combining a bear with a beaver, and the "Pandeaver," a "Wuzzle" combining a panda with a beaver. The names, however, are not substantially similar, and the artistic renditions are thoroughly dissimilar.[4] The fact that both combine a bear, or, more accurately, a bear-like character (a panda looks like a bear but is actually a member of the raccoon family), with a beaver does not, standing alone, render these characters substantially similar.

Plaintiffs, however, focus on two different sets of characters. They argue that defendants' "Moosel," a moose and seal combination, copies their "Wissh," which they assert combines a walrus with a seal. Frankly, plaintiffs' contention that the "Wissh" combination includes a seal stretches the outer limits of artistic license. (It looks more like a walrus and a fish.) Accepting the claim, however, we still do not see any substantial similarity between the two characters.

Alternatively, plaintiffs make much of the similarity between "Leo-Lamo," a lion-lamb "What," and "Bumblelion," a bumble-bee-lion "Wuzzle," both of which have strong character profiles. Setting aside the obvious physical dissimilarities between the two, it should not seem so strange that the lion-like creation would be assigned a "king of the jungle"-like character. Certainly, any similarities in character traits

---

**3.** We suspect that plaintiffs' true frustration in this case grows from a belief that corporate giants have "stolen" their idea. Not only do we find that this isn't so and that the copyright laws do not protect the idea itself, but, with all due respect to the parties, the concept of combining two animal forms is hardly novel or unique. Pegasus, the winged horse, was a product of Greek mythology. It may not have been the first such character, and it certainly was not the last. We note, for example, the Griffin, often depicted in crests, which combines an eagle with a lion. The point, however, is that defendants have no more "stolen" plaintiffs' idea than have plaintiffs "stolen" the idea from Greek mythology. In fact, we note that if anyone in this case has a claim to "prior creation" it is Disney, and not plaintiffs. Disney's "Jumble Isle" characters were registered for copyright protection on April 18, 1984, over five months before plaintiffs registered the "Whats."

**4.** We recognize that our task is to determine if the works are "substantially similar." In doing so, we must focus on the similarities, and not the dissimilarities, between the creations. Judge Learned Hand succinctly stated the reason for this subtle, but important, distinction when he observed, "[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir.), *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). It is for this reason, for example, that we do not focus on the fact that each of the "Wuzzles" characters had wings, and the "Whats," with the exception of "Ch-uck," did not. If the "Wuzzles" are illegal copies of the "Whats," the addition of wings to disguise the infringement would probably not save the defendants. For a more complete discussion of the similar/dissimilar distinction and the inherent, analytical tensions it creates, see *Warner Bros.*, 720 F.2d at 241–42. Our considered use of the terminology "thoroughly dissimilar," however, does not suffer from the same tensions. It stands to reason that if two works are so thoroughly dissimilar they cannot be, at the same time, substantially similar. We state the test here in the inverse not merely for variety, but for emphasis.

between "Leo-Lamo" and "Bumblelion," even assuming access, do not give rise to a reasonable inference that there has been illegal copying. Summary judgment has been granted in copyright infringement cases which, in our view, present much closer questions as to substantial similarity than are presented by the "Beavaire"/"Pandeaver," "Wissh"/"Moosel," and "Leo-Lamo"/"Bumblelion" comparisons. *See, e.g., Warner Bros.,* 720 F.2d 231 (Superman infringement case); *Eden Toys,* 675 F.2d 498 (snowman toy infringement case).

With respect to the storylines, plaintiffs' make a broad assortment of generalizations as to the similarities between the storyline concepts. Again, although the storyline concepts are similar, the specific content is not. First, because the "Wuzzle" and "What" characters are completely different, it follows that the storylines about each character must, by necessity, be somewhat different. Second, the "Whats" storylines are in poetic form; the "Wuzzles" storylines are not. Third, defendants offered affidavits attesting that storylines typically are introduced with stuffed characters of this sort. Not only is this eminently ascertainable through common experience, but plaintiffs have offered nothing of substance to suggest it isn't so. Again, plaintiffs have not "cornered the market" with respect to the storyline concept by virtue of their copyright. It is only the particulars of their copyrighted storylines that are protected, and there are not substantial similarities between the "Whats" and "Wuzzles" storylines.

Finally, the artistic renditions speak for themselves. It often has been said that "a picture is worth a thousand words," and we attach copies of drawings depicting the "Wuzzles" and "Whats" characters.[5] We will not belabor the obvious. Suffice it to say that we find no artistic similarities between the works.

In sum, we find that there is not substantial similarity between the "Whats" and "Wuzzles" characters. Because "no reasonable jury, properly instructed, could find that the two works are substantially similar", *Warner Bros.,* 720 F.2d at 240, we grant defendants' motion for summary judgment on the copyright claim.

**b. The Unjust Enrichment Claim**

█ Plaintiffs, in addition to the copyright violation claim, assert that defendants, by misappropriating the "Whats" concept and characters, were unjustly enriched. We exercise pendent jurisdiction over this state cause of action given the overlap in issues with the federal claim and in the interests of "judicial economy, convenience and fairness to litigants." *Walker,* 784 F.2d at 53 (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).

The Copyright Act expressly preempts all legal or equitable state actions "that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). This section has been accorded the broad sweep intended by Congress. *See Walker,* 784 F.2d at 53 (preempting state claim of unfair competition); *Financial Information, Inc. v. Moody's Investors,* 751 F.2d 501, 510 (2d Cir.1984) (holding misappropriation claim preempted if copyright claim succeeds); *Universal City Studios, Inc. v. Nintendo Co. Ltd.,* 615 F.Supp. 838, 857 (S.D.N.Y. 1985), *aff'd,* 797 F.2d 70 (2d Cir.1986) (preempting unjust enrichment claim). To the extent that plaintiffs' second cause of action derives from the misappropriation of material covered by copyright protection, our earlier grant of summary judgment preempts that claim.

To the extent plaintiffs can show that defendants have been unjustly enriched by material beyond copyright protection, and if the elements of quasi-contract are present, their second claim may survive a preemption challenge. *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 200 (2d Cir.1983). Plaintiffs,

---

**5.** The "Wuzzles" drawings are reasonable likenesses of the toys created by defendants (submitted as exhibits on this motion). The "Whats" were not (at least generally) manufactured as toys by plaintiffs or anyone else.

however, as the non-moving party, cannot simply rest on the allegations in their complaint and survive a motion for summary judgment when the defendants have offered evidence, outlined above, suggesting that nothing of plaintiffs' was misappropriated. *See* earlier discussion on summary judgment. Other than rehashing the copyright claim, plaintiffs have not offered one scintilla of evidence distinguishing this second cause of action or showing that defendants have been unjustly enriched at plaintiffs' expense. Defendants' motion for summary judgment as to the second claim, therefore, also is granted.

### III. Attorney's Fees and Sanctions

Finally, defendants have moved for attorney's fees and sanctions under 17 U.S.C. § 505, 28 U.S.C. § 1927, and Rule 11 of the Federal Rules of Civil Procedure. Each of these provisions vests discretion with the court. Defendants contend that awards would be proper given the allegedly frivolous and vexatious nature of this litigation.

The concept of awarding attorney's fees and sanctions necessarily involves a balancing process, weighing the need for discipline in a particular case and its impact as a deterrent with the need to ensure an environment that will allow effective assistance of counsel, in every sense of its meaning, to flourish. The state of the law on this subject in the Second Circuit has been covered thoroughly in recent opinions. *Oliveri v. Thompson,* 803 F.2d 1265 (2d Cir. 1986); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985). Consistent with the concepts embodied in those opinions, and although we do not cite this complaint or its pursuit as models for future litigants, we do not believe that attorney's fees or sanctions are justified. Defendants' motions in that regard are denied.

### CONCLUSION

On defendants' various motions, we find that:

(1) there "wuzn't" substantial similarity between the "Whats" and the "Wuzzles," and summary judgment on the copyright infringement claim is granted;

(2) plaintiffs' cause of action in quasi-contract "wuz" preempted by the federal copyright laws and grant defendants' motion for summary judgment on that claim; and

(3) this action "wuzn't" sufficiently frivolous or vexatious so as to warrant attorney's fees or sanctions, and defendants' motions for such are denied.

SO ORDERED.

WALT DISNEY PRESENTS

TYCOON™
BUTTERBEAR™
BUMBLELION™
KOALAKEET™
WOOLRUS™
ELEROO™

"Collect all the lovable Wuzzles... and share in each Wuzzle's very own storybook adventure!

PIGGYPINE™

RHINOKEY™

PANDEAVER™

SURFACE WASHABLE ONLY

HASBRO SOFTIES

MOOSEL™

HOPPOPOTAMUS™

ADULTS NOTE:
To remove product from package - cut cable tie

Contents: All new materials, synthetic and cellulose fibers.
Made in Korea.

BEAV-AIRE ...

000021

LEO LAND

WHAT'S WHAT IN WHAT LAND?

000017

000015

SKEET"

WHAT) W"" "" ""GHLAND"
*

CH·UCK ™

WHATS WHAT IN WHATLAND ™

000009

1284

ME·OUSE ™

FRONT

© 1984 GUGGAN·iT

WHAT'S WHAT IN WHATLAND ™

BACK

000007