**SABAN ENTERTAINMENT, INC. a Delaware Corporation, and Capcom U.S.A., Inc., a California Corporation, Plaintiffs,**

v.

**222 WORLD CORP.; Fine World Int'l Trading Corp.; Idea Creations Inc., doing business as Four Seasons Creations Inc.; Lucky International Corp.; M.C. Toy Trading Corp.; MK Trading Co. Inc.; New Dragon Toy Wholesalers Inc.; Panaria International Inc.; Sona USA Co., Inc.; Top Fashion Trade Co.; and various John and Jane Does 1–100, Defendants.**

No. 94 Civ. 6043 (CSH).

United States District Court,
S.D. New York.

Oct. 19, 1994.

---

Gibney, Anthony & Flaherty, New York City (Brian W. Brokate, Heather J. Mc-Donald, John Macaluso, of counsel), Baker & Hostetler, Los Angeles, CA (Belinda J. Scrimenti, Anthony M. Keats, Lynn S. Loeb, Marc I. Seltzer, of counsel), for plaintiffs.

Hedman, Gibson & Costigan, P.C., New York City (Kenneth F. Florek, of counsel), for defendant Panaria Intern., Inc.

HAIGHT, District Judge.

In this action involving characters based upon a popular children's television program, plaintiff asserts claims for copyright infringement, Lanham Act violations, and pendent state and common law claims. Plaintiff moved for a preliminary injunction. Following an evidentiary hearing, I grant the motion for the reasons that follow.

### Background

Plaintiff Saban Entertainment, Inc. ("Saban") holds the United States certificates of copyright registration for all episodes of the television program "Mighty Morphin Power Rangers," a phenomenally successful action series avidly followed by children. Saban owns all copyrights, trademarks and other proprietary rights to the Mighty Morphin Power Rangers (hereinafter "Power Rangers"). Saban is also the sole and exclusive licensee in the United States of rights in the federally registered copyright in the live motion picture "Che Ju Ye Rangers," a Japanese creation. Saban has in turn licensed Bandai America, Inc. ("Bandai") to produce and market certain toy products derived from the Power Rangers.

The basic concept of the Power Rangers is that six seemingly ordinary teenagers transform (or "morph") themselves into powerful beings, each associated (in ways the present record does not make clear) with a particular dinosaur, and each dressed in a helmet, uni-

form, gloves and boots of distinctive colors. The color of each Ranger's uniform becomes a part of his or her designation: thus there is the "Red Ranger," the "Pink Ranger," the "Yellow Ranger," the "Black Ranger," the "Green Ranger," and the "Blue Ranger." Thus transformed by the morphing process, Rangers become potent warriors in the endless battle between good and evil.

As copyright owner and exclusive licensee, Saban has created and commercially exploited such Power Ranger-related merchandise as clothing and toys (primarily toy figures of the Rangers). These items have achieved extraordinary success in the market. Even the largest toy retail stores are unable to keep the products in inventory. Saban is trying hard to increase its factories' output to satisfy a remarkable demand.[1]

Saban commenced this action against several retailers in the New York area, complaining of defendants' sale of allegedly infringing items. Various items were seized pursuant to an order signed by Judge Sotomayor in Part I. The complaint identified ten defendants by name and referred to 100 additional "John and Jane Doe" defendants, none of whom has subsequently been further identified.

Of the ten named defendants, only Panaria International Inc. ("Panaria") has contested Saban's claims. Panaria operates a retail toy and novelty store at 17 West 29th Street in Manhattan. The other defendants either consented to injunctive relief or defaulted. Appropriate injunctive orders have been entered against them. An evidentiary hearing was held on Saban's motion for a preliminary injunction against Panaria.

The items seized from Panaria included a plastic helmeted red clad figure seated on a futuristic armed motorcycle (PX 7); a helmeted red clad figure packaged under the name "5–Star Commando" (PX 10); and a boxed collection of six helmeted figures clad in distinctive colors, astride motorcycles, packaged under the name "Mega Rangers Power Bike" (PX 11). Saban also seized

from Panaria's premises groupings of smaller figures (PX 4, PX 9, PX 12). At the beginning of the hearing, Panaria contested Saban's claims as to each of these items. However, Panaria now consents to injunctive orders with respect to the larger figures (PX 7, 10, and 11). The disputes are accordingly limited to the smaller figures.

### Discussion

■ To obtain a preliminary injunction, a plaintiff must demonstrate: (1) either a likelihood that he will succeed on the merits, or that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, plaintiff will suffer irreparable harm before the court can rule upon his claim. *Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.,* 25 F.3d 119, 122 (2d Cir.1994).

### The Copyright Claim

■ Saban has established a likelihood of success on its claim of copyright infringement. The validity of Saban's Power Ranger copyrights is established *prima facie* by the certificates of registration issued with respect to them, and Panaria does not contest validity. A plaintiff with a valid copyright proves infringement by demonstrating that (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's. *Well–Made,* at 122–23; *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir.1992).

■ Copying may be proved by direct evidence, or by showing that the defendant had access to the plaintiff's work and that the works are sufficiently similar to support the inference that defendant copied plaintiff's work. *Well–Made,* at 123. Saban offers no proof of direct copying. But the Power Rangers and their derivative products have enjoyed enormous popularity in the United

---

1. Co-plaintiff Capcom U.S.A., Inc. is the exclusive licensee in the United States of all copyrights, trademarks and other proprietary rights relating to other audiovisual characters and their

derivative products. Capcom's claims against the several defendants were resolved by injunctions entered on consent or by default and are not further addressed in this opinion.

States since the television series began a year ago. Panaria, as well as the presently unidentified manufacturer of the products Panaria sold at retail, clearly had access to the products for which Saban held copyrights.

■ Accordingly Saban's likelihood of success on its copyright claims turns on whether there is a substantial similarity between the products sold by Panaria and the protectable elements of Saban's products. To be illegal, an infringing product must copy elements of the copyright owner's product that are protectable under copyright law. This principle is frequently voiced by saying that "[t]he plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea." *Well–Made*, at 123, citing *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 912 (2d Cir.1980). As Judge McLaughlin said in *Well–Made*, at 123: "Parrotry does not always mean piracy."

In the case at bar, Panaria's main point of defense is that any similarities between the products it sold and Saban's copyrighted products do not relate to protectable elements. On that point, Panaria says that *Mattel, Inc. v. Azrak–Hamway International, Inc.*, 724 F.2d 357 (2d Cir.1983), "controls." Brief at 2.

In *Mattel* plaintiff owned a registered copyright in a series of dolls called "Masters of the Universe." These dolls had different heads, clothing, and names, but all shared "a common torso, which is a sculptor's exaggerated rendering of a bodybuilder's body with overdeveloped musculature and legs proportionately shorter than the average human being's." 724 F.2d at 360. The dolls were posed in a crouching position evocative of a fighting stance. Defendant's allegedly infringing dolls "all [had] names, heads, feet, hands, and clothing different from" plaintiff's dolls. *Id.* Nearly all the similarity between the two products related to their heavily muscled torsos and fighting stances. The Second Circuit held that the rendering of the idea of "a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose" was "not in itself protectable"; and that "a lay observer would recognize certain differences in the way the two sculptors have created images of strength by overemphasizing certain muscle groups." *Id.* The court of appeals affirmed the district court's denial of a preliminary injunction.

*Mattel* is instructive in the case at bar but its rationale favors Saban, not Panaria. A comparison of the parties' products reveals similarities that go far beyond a generic masked heroic figure. As Panaria's exhibits show, such figures abound in the history of "comic" books, cartoons, and comparable sources of entertainment for children. But the Power Rangers have distinctive features rarely, if ever, found in combination: helmets covering the entire head, with dramatic black apertures for vision, and adorned with features of the dinosaur associated with each character; white gloves and boots which contrast with the primary colors of the uniforms, and are decorated with diamond shapes reflecting those colors; white chest markings; and wide belts (white or silver) with holsters for weapons.

As noted, Panaria has consented to an injunction forbidding it from marketing larger size toys. The products still in contention are much smaller figures. The figures comprising PX 4 and PX 12 measure three inches from upraised hands to the feet. The figures comprising PX 9 are smaller still, measuring 2–¾ inches from head to foot. But even on these reduced areas, the manufacturer has managed to include a sufficient number of similarities to create an unmistakable evocation of the Power Rangers. The distinctive helmets worn by the Power Rangers are reproduced on each accused figure: covering the entire head, with the black apertures for the eyes and a smaller aperture for the mouth. The slightly larger figures comprising PX 4 and X 12 also reproduce what I take to be ear apertures. If they are not, they are design effects which these accused products copy. The helmets of the figures comprising PX 9 manage to reproduce the beak-like effect of the Pterodactyl, the dinosaur associated with the Pink Ranger (*see* PX 13). The helmets of the other accused figures copy the Red Ranger's helmet, in-

cluding the raised, tapering representation of the head, complete with holes for nostrils, of the Tyrannosaurus Rex, that Ranger's *Jurassic Park alter ego.* Together with the Red Ranger, the figures in PX 4 and PX 12 have large white markings in the middle of the chest; smaller white markings to either side; belts with large buckles; and a holster displayed on the right hip. The smaller figures comprising PX 9 have jagged lightning flashes, rather than white markings, on the chest.

Panaria points to certain differences. The genuine Power Rangers' center chest markings are rhombuses, whereas the chest markings of the accused figures comprising PX 4 and PX 12 are pentagons and, as noted, flashes in the case of the PX 12 figures; the PX 4 and PX 12 figures have white boots but no white gloves (the PX 9 figures, like the Power Rangers, have white boots and white gloves). I conclude, however, that such differences as exist between Saban's products and those sold by Panaria result from the small size of the accused figures and the expense of attempting to reproduce each and every feature of the protected product.

It is also worthy of note that the uniforms of the accused figures are the same colors as those of the six Power Rangers.[2] Panaria argues that primary colors are not protectable. "If we can't have" those colors, counsel argued in summation, "then what is left?" Well, white, for one, or khaki for another. At the time the accused products were probably manufactured there was no "White Ranger," although his advent in the series is a much anticipated event later this month. In evaluating substantial similarity, color schemes are "not to be entirely overlooked," *Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.,* 490 F.2d 1092, 1094 (2d Cir.1974), which then cited and quoted *Couleur International Ltd. v. Opulent Fabrics Inc.,* 330 F.Supp. 152, 153 (S.D.N.Y.1971), for the proposition that "[t]he appearance in one of defendant's fabrics of colors identical to plaintiff's is additional evidence of copying . . ." In the case at bar, I think the fact that the accused products' colors were limited to those being displayed at that time by the protected products is probative of copying.

Saban does not claim that the concept of a uniformed or costumed action hero or heroine is protectable; nor could it do so. Copyright law does not protect basic character types. *Jones v. CBS, Inc.,* 733 F.Supp. 748, 753 (S.D.N.Y.1990). Only uniquely developed characters expressing some degree of originality are copyrightable. *Jones,* 733 F.Supp. at 753. In general, "the less developed the characters, the less they can be copyrighted." *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121–22 (2d Cir.1930), *cert denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

In determining whether characters in a second work infringe preexisting characters, courts consider not only the visual resemblance of the characters, but also the totality of the characters' attributes and traits:

> A graphic or three-dimensional work is created to be perceived as an entirety. Significant dissimilarities between two works of this sort inevitably lessen the similarity that would otherwise exist between the total perceptions of the two works. . . . [t]he visual perception of the character tends to create a dominant impression against the character may be readily compared, and significant differences readily noted.

*Warner Bros., Inc. v. American Broadcasting Co.,* 720 F.2d 231, 241–42 (2d Cir.1983). In assessing the ultimate question of substantial similarity, the Court analyzes both similarities and differences between characters, since characters that are thoroughly dissimilar cannot at the same time be substantially similar. *Selmon v. Hasbro Bradley, Inc.,* 669 F.Supp. 1267, 1272 n. 4 (S.D.N.Y.1987).

The Court's task is to "draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appear-

---

**2.** PX 9 collects six figures on a ring, each one clad in one of the colors worn by the six Power Rangers. PX 4 and 12 are comprised of figures displaying four colors: red, black, blue, and green.

ance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the first character is reminiscent of the first one." *Warner Bros.*, 720 F.2d at 242.

*Well–Made*, the Second Circuit's most recent venture into the toy industry, restates and applies these principles. Plaintiff held copyrights on human baby dolls and animal dolls, including a mouse doll. It alleged that defendant's dolls infringed the copyrights on the human and mouse dolls. Because babies and mice are not protectable, plaintiff's products contained both protectable and unprotectable elements. On the question of substantial similarity, the Second Circuit said in *Well–Made:*

> We focus on whether an ordinary lay observer would overlook the dissimilarities between the artistic (protectible) aspects of the two works and would conclude that one was copied from the other. *See Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 765 (2d Cir.1991). Where, as here, we compare products that have both protectible and unprotectible elements, we must exclude comparison of the unprotectible elements from our application of the ordinary observer test. *See Laureyssens,* 964 F.2d at 141 (referring to this as "the more discerning ordinary observer test").

25 F.3d at 123

On the merits, the court of appeals reached different conclusions with respect to the human dolls and the mouse dolls. As to the human dolls, plaintiff had shown a likelihood of success on its copyright infringement claim because:

> Our *de novo* comparison of the dolls' protectible features convinces us that an ordinary observer would consider them substantially similar. Both sport the same bright, painted eyes, the same skyward gaze, the same knobby nose, and the same cherubic smile. Both have oversized heads that feature soft vinyl faces and curly tufts of hair peeking out beneath lace-frilled hoods. Those dolls do not merely share features that are common to all dolls; they

contain virtually identical expressions of those features. In short, Baby Dolly Mine expresses the idea of "doll" in a way that is almost indistinguishable from the expression in the Puffalump Kids doll.

*Id.*

Plaintiff failed to make the requisite showing on the mouse dolls:

> We accept Well–Made's argument as to the mouse dolls, however, because their protectible elements are substantially *dissimilar.* While these dolls have similar body types, the artistic work on the faces is entirely distinct: Well–Made's mouse has large, oval, sleepy eyes, an open-mouthed smile, whiskers, and exaggerated puffy cheeks. Its head is shaped like a parabola. Overall, Well–Made's doll conveys the impression of an etherized rabbit, not a mouse. In contrast, Fisher–Price's mouse has small, round beady eyes, a thin mouth, and no whiskers or cheeks. Its head is flatter and rounder than the Tender Tots dolls. True, Fisher–Price's doll does not much resemble a mouse either; however, it looks more like a bear cub than a rabbit.

*Id.*

For the reasons previously stated, Saban has shown a likelihood of success on its copyright infringement claims with respect to the products Panaria has not conceded should be enjoined. The slight differences Panaria relies upon do not alter the substantial similarity created by the totality of the products' appearances and distinctive traits. Using the Second Circuit's analysis in *Well–Made* as an analogous exercise in line drawing, the accused products must be placed with the infringing human dolls, rather than with the non-infringing mice.

Thus under Second Circuit case law, on its copyright claim Saban satisfies the first prong of the preliminary injunction criteria, unless certain correspondence between Panaria's president, Yang Cho, and the U.S. Customs Service of the Department of the Treasury requires a different result.

■ By letter dated May 12, 1994, Cho sent to the Customs Service samples of two

plastic sculptures of Bandai products, designated the "Black Ranger" and "Green Ranger." Cho also sent Customs two sculptures of the kind being marketed by Panaria. All four exemplars, three inches in length, were small enough to be carried on key chains or necklaces. Cho asked Customs for a ruling as to whether the products it was selling infringed the Bandai copyrights.

By letter dated June 28, 1994, signed by John F. Atwood, Chief of the Intellectual Property Rights Branch, Customs issued an administrative ruling that a substantial similarity did not exist between the Panaria and Bandai products. In reaching that conclusion Customs relied upon Ninth Circuit authority and a case decided by the Eastern District of Missouri. For an exposition of its role in issuing copyright infringement decisions, Customs cited *Miss America Corporation v. Mattel, Inc.*, 945 F.2d 536 (2d Cir. 1991).

In *Miss America* the defendant, copyright owner of the highly successful "Barbie" doll, filed an application with Customs to prevent plaintiffs from importing into the United States allegedly infringing dolls. Plaintiffs sued Mattel and Customs in the district court, seeking an injunction ordering those parties to cease interfering with the importation of their products, and to require Mattel to assert all its claims in the district court. The district court denied the injunction on the ground that plaintiffs had failed to exhaust their appellate administrative remedies in the Customs proceeding, Customs having made a finding of substantial similarity and consequent infringement while the case was *sub judice* before the district court. The Second Circuit, affirming the district court's holding that judicial intervention was premature, stated that "Congress has granted Customs some independence and autonomy in making determinations of infringement regarding items imported into the United States, and as a separate executive agency

with its own powers and duties, it is entitled to our forbearance as it carries out its duties." 945 F.2d at 544.

Panaria cites *Miss America* for the proposition that Customs has a level of expertise in infringement cases sufficient to endow its administrative ruling in the case at bar with persuasive effect in this Court. But *Miss America* does not paint with so broad a brush. It is one thing to require an allegedly infringing importer to exhaust its administrative remedies before asking the district court to intervene. It is quite another to suggest that a copyright owner, with statutory access to the district court guaranteed under the Copyright Act, is bound or even prejudiced by a Customs ruling obtained by a marketer in an administrative proceeding of which the copyright owner had no notice and in which its own copyrights were not involved.[3] *See also Miss America*, at 541 ("By enacting the copyright laws Congress favored creators of original works over those who might copy them. This policy is furthered by granting copyright holders a broader range of legal options to protect themselves from infringement than those given to alleged infringers to press their claims of innocence.").

In the case at bar, Saban invoked the copyright laws to protect its products (not Bandai's) against infringement by Panaria. In evaluating the merits of Saban's claim in the light of controlling Second Circuit authority, I am neither instructed nor inhibited by the Customs ruling, which involves other copyrights and relies upon cases decided in other circuits.[4]

In short, Saban's likelihood of success on its copyright claim, demonstrated in the light of Second Circuit authority, is not affected in any way by the Customs ruling Panaria obtained.

*The Trademark Claims*

■ Section 43(a) of the Lanham Act makes "a false designation of origin" action-

3. As noted, the exemplars Cho sent to Customs were small figures produced by Bandai under its license from Saban. Customs did not have before it the larger products sold by Saban under its copyrights.

4. Panaria derives no equitable leverage from the Customs ruling because Cho's testimony at the hearing showed that Panaria had begun selling its products before requesting the Customs ruling, and continued to sell off its inventory of some 2,000 items before receiving Customs' reply.

able. One way to designate a product's origin falsely is to copy its trade dress. "The 'trade dress' of a product is essentially its total image and overall appearance." *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir.1989), *cited and quoted* in *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, —— n. 1, 112 S.Ct. 2753, 2755 n. 1, 120 L.Ed.2d 615 (1992). Trade dress "involves the total image of a product and may include features such as size, shape, color, or color combinations, texture, graphics, or even particular sales techniques." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983), also cited and quoted in *Two Pesos*, —— U.S. at —— n. 1, 112 S.Ct. at 2755 n. 1. The concept of trade dress as a protectable form of trademark has evolved in the law. "Over time, judges have come to conclude that packages or images may be as arbitrary, fanciful, or suggestive as words or symbols, their numbers limited only by the human imagination." *Two Pesos*, —— U.S. at ——–——–——, 112 S.Ct. at 2766–67 (Thomas, J., concurring in the judgment).

▇ The instant case is one for trade dress infringement. Saban's basic product is a costumed action hero. The trade dress displayed by the Power Rangers has been described *supra*. Saban has established a likelihood of persuading the factfinders that the Power Rangers' trade dress is inherently distinctive. An inherently distinctive trade dress is protectable under § 43(a) of the Lanham Act without a showing that it has acquired secondary meaning. That is the holding of *Two Pesos*. Saban argues in the alternative that likelihood of success on secondary meaning should be inferred from the advertising campaigns and remarkable sales successes enjoyed by the Power Rangers over the past year. I need not reach that alternative basis because Saban has a strong case on the inherently distinctive issue.

▇ Of course, ultimate success on a Lanham Act claim "also ... requires proof of the likelihood of confusion." *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2758. In the preliminary injunction context, likelihood of consumer confusion is usually guided by the non-exclusive factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *See, e.g., Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (1993). Those factors are: (1) the strength of the plaintiff's mark or dress; (2) the similarity between the two marks or dresses; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.

In the case at bar, factors (1)–(3), (7) and (8) all militate strongly in favor of likelihood of consumer confusion. Factor (4), bridging the gap, is not implicated in this case. On the present record Saban offers no impressive evidence of actual confusion,[5] but that is not a prerequisite to a preliminary injunction in all cases. As to factor (6), defendant's bad faith, I have previously noted that the evidence arising out of Panaria's correspondence with Customs is equivocal. *See* n. 4, *supra*.

Therefore I conclude that Saban has shown a likelihood of success on its Lanham Act claim. I reach the same conclusion on its claims under the New York Anti–Dilution statute and the state common law of unfair competition.

*Irreparable Harm*

▇ Any movant for a preliminary injunction must show the likelihood of irreparable harm before the court can rule on his claim. In the context of a preliminary injunction motion, upon a showing of copyright infringement a plaintiff is entitled to the presumption of irreparable harm. *See Well–Made*, 25 F.3d 119, at 124; *Video Trip Corp. v. Lightning Video, Inc.*, 866 F.2d 50, 51–52 (2d Cir.1989); *Lida, Inc. v. Texollini, Inc.*,

---

**5.** The only evidence proffered is a letter from an out-of-state retailer selling the infringing products who received a cease-and-desist letter from counsel for Saban. That retailer protested that he thought the products were genuine. It is a predictably defensive response by a challenged retailer and is of little value in showing or predicting consumer confusion.

768 F.Supp. 439, 443 (S.D.N.Y.1991); *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 246–47 (S.D.N.Y.1990). "[T]his is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways." *Well–Made,* 25 F.3d at 124. This presumption also attaches to a plaintiff's showing of likelihood of confusion under its Lanham Act claims. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988) ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm ... assuming that the plaintiff has a protectible mark."); *Home Box Office v. Showtime/The Movie Channel,* 832 F.2d 1311, 1314 (2d Cir.1987). Having made these showings, plaintiff is clearly entitled to the presumption of irreparable harm. While the presumption disappears if the plaintiff unreasonably delays in prosecuting its infringement claim, *see Well–Made,* 25 F.3d at 124; *Hasbro,* 858 F.2d at 79, that circumstance does not arise in the present case.

■ Panaria attempts to rebut this presumption by noting that the insatiable demand for Saban's licensed products far outweighs its present capacity to produce them. Panaria's argument is that its continued sale of the infringing products cannot affect the market for the authentic toys given that the toys manufactured by Saban's licensee are snatched up by consumers just as quickly as they can be manufactured. Panaria cites *Mattel, Inc. v. Azrak–Hamway, supra,* as its sole support for this argument. But, reliance upon this case is unwarranted. *Mattel* does not hold that irreparable harm cannot be demonstrated when the plaintiff is unable to meet the demand for its products. Quite the contrary, the *Mattel* court did not even address the issue of irreparable harm. Rather, the court reviewed and affirmed the district court's conclusion that plaintiff had not shown either prong of the second requirement for a preliminary injunction: a likelihood of success on the merits, or serious questions going to the merits and a balance of hardships in its favor. Panaria correctly notes that the *Mattel* court considered, to plaintiff's detriment, its inability to satisfy the demand for its products. However, it was addressed as only one factor in the balance of the hardships analysis, an analysis different from that of irreparable harm. Moreover, in concluding that the balance of the hardships favored defendant, the court also stressed that "for inadequately explained reasons [plaintiff] delayed bringing this action until just before the start of the Christmas season." *Id.* at 361. No comparable criticism can be leveled at Saban, which moved promptly against Panaria and other marketers of the infringing products.

I am accordingly not persuaded that Saban's inability to meet present demand for its licensed products is sufficient to rebut the presumption of irreparable harm arising from the showing of substantial similarity and likelihood of confusion.

■ Nevertheless, Saban has not relied solely upon the presumption to establish a risk of irreparable harm. It is unchallenged that Saban licenses the manufacture of only high quality Power Rangers products and that manufacture and sale of the toys will continue indefinitely given the remarkable and sustained popularity of those figures. Saban argues that the sale of Panaria's cheap and inferior toys which imitate Saban's authentic products detrimentally affects Saban's reputation for quality. The very finding of a likelihood of confusion between Panaria's and Saban's products establishes the inevitability of this result. A consumer who purchases one of Panaria's toys believing it to be a genuine Power Ranger product will note, and perhaps be disappointed by, its inferior quality.

Damage to Saban's reputation in the toy market is the sort of harm which is impossible to quantify, and also generates the potential of diminished demand for its licensed products. This sort of reputational erosion is sufficient to support a finding of irreparable harm. *See Wales Industries, Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 521–22 (S.D.N.Y.1985) (Weinfeld, J.) (the adverse impact on plaintiff's reputation by defendant's distribution of inferior toys which could potentially cause reduction of demand for plaintiff's products was sufficient to establish irreparable demand in infringement action); *Swatch, S.A. v. Siu Wong Wholesale,*

1992 WL 142745 *5 (S.D.N.Y. June 8, 1992) (continuing sale of infringing watches caused loss of good will and reputation to plaintiffs which adequately demonstrated irreparable harm); *cf. Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971) (Friendly, J.) ("[I]f an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.").

Size is a significant difference between the Saban and the Panaria products still at issue. The Saban products are larger. They can do more: move their heads, arms and legs. The three-inch Panaria figures have fixed limbs. But there are differences in quality which transcend size. Power Ranger three-inch figures are marketed by Bandai under a sub-license from Saban. A Bandai figure is in evidence as Exhibit 6. It is obviously superior in quality to the Panaria products, in posture, molding, delineation of features, and execution of the design of the uniforms. Saban is damaged by those quality differences because, as a copyright holder, it is entitled to select its sub-licensees and thus ensure the quality of the entire Power Ranger product line.

In light of the demonstrated risk of damage to plaintiff's reputation and the presumption to which plaintiff is entitled, I conclude that plaintiff has made the requisite showing of irreparable harm.

For these reasons, a preliminary injunction will issue. Counsel for plaintiffs are directed to settle an order and injunction consistent with this opinion on seven (7) days' notice within ten (10) days of the date of this opinion. The temporary restraining order, continued on consent, remains in effect in the interim.

A scheduling order governing the further conduct of the litigation is being entered concurrently with this opinion.

It is SO ORDERED.